UNITED STATES of America

v.

GRINNELL CORPORATION, American District Telegraph Company, Holmes Electric Protective Company, and Automatic Fire Alarm Company of Delaware.

Civ. A. No. 2785.

United States District Court
D. Rhode Island.

Nov. 27, 1964.

See also 30 F.R.D. 358.

**246**

Frank A. Fritz, Robert L. Conkling, Frank A. Fritz, Jr., Averill M. Williams, Robert O. Donnelly of Bleakley, Platt, Schmidt, Hart & Fritz, New York City, and Matthew W. Goring of Hinckley, Allen, Salisbury & Parsons, Providence, R. I., for defendants American District Telegraph Co., Holmes Electric Protective Co., and Automatic Fire Alarm Co. of Delaware.

Denis G. McInerney of Cahill, Gordon, Reindell & Ohl, New York City, and Roger T. Clapp, Providence, R. I., for defendant Grinnell Corp.

WYZANSKI, District Judge.

There follow in order an introduction, findings of fact, conclusions of law, opinion on liability, and opinion on remedy.

## A. INTRODUCTION

This is a civil suit wherein the Government complains that Sections 1 and 2 of the Sherman Act [Act of July 2, 1890, c. 647, 26 Stat. 209, 50 Stat. 693, 15 U.S.C. §§ 1, 2] have been violated by Grinnell Corporation, a Delaware corporation with its principal place of business in Providence, Rhode Island, (hereafter called "Grinnell"), and three corporations, a majority of the capital stock of each of which is owned by Grinnell, to wit, American District Telegraph Company, a New Jersey corporation, (hereafter called "ADT"), of whose capital stock Grinnell owns 76%, Holmes Electric Protective Company, a New York corporation, (hereafter called "Holmes"), of whose capital stock Grinnell owns 100%, and Automatic Fire Alarm Company of Delaware, a Delaware corporation, (hereafter called "AFA"), of whose capital stock Grinnell owns 89%. All these 3 corporations have their principal place of business in New York. Collectively, the 3 corporations are referred to sometimes as the "affiliates", and sometimes as the "alarm companies."

Complaint, seeking relief under § 4 of the Sherman Act [26 Stat. 209, 15 U.S.C. § 4], was filed April 13, 1961. Extensive pre-trial discovery and frequent pre-trial conferences with the Court, and, above all, the co-operation of informed, in-

Noel E. Story and Hugh P. Morrison, Jr., Dept. of Justice, for plaintiff.

dustrious, and experienced lawyers, who jointly took 128 depositions (totalling over 8,000 pages), to a large extent disclosed to each other proposed exhibits, entered into 5 stipulations, (totalling 58 pages), and exchanged careful, thorough, pre-trial briefs (in excess of 400 pages), enabled the parties at the outset of the trial to lay before the Court 1181 exhibits comprising approximately 15,000 pages. The preliminary procedural and substantive steps reduced the taking of testimony in open Court to six days, from June 15, 1964 to June 24, 1964. The Court, at the conclusion of the testimony, required each party to use the summer recess to limit to 40 pages the principal portion of its brief, with a right to annex appendices of unlimited length. Oral arguments upon those briefs and replies thereto took place on October 9, 1964.

Before findings, conclusions, and opinions are set forth, this Court takes this opportunity to make explicit certain aspects of its approach to this controversy.

This Court is mindful that in recent years antitrust litigation, particularly Government civil actions alleging violations of § 2 of the Sherman Act, have involved an enormous, nearly cancerous, growth of exhibits, depositions, and *ore tenus* testimony. Few judges who have sat in such cases have attempted to digest the plethora of evidence, or indeed could do so and at the same time do justice to other litigation in their courts. Nor is there any sound reason to believe that such extensive presentation accomplishes any important legal or other social end.

Historically, the major explanation of prodigious records probably is the lack of certainty both at the bar and on the bench as to what was the scope of § 2, and, even to some degree, of § 1 of the Act. Fluctuations in Supreme Court interpretation of the statute prevented lawyers no less than laymen from having confidence as to how an antitrust controversy would be viewed in the Supreme Court, and those who were in authority were unwilling prematurely to draw sharp boundaries of relevance and materiality.

Time, however, has hardened the lines of interpretation of the Act. No doubt, courts have been aware that the text of the Sherman Act, *simpliciter*, though it withstood early attacks grounded on the charge that it was so vague as not to meet the due process standard of the Fifth Amendment to the United States Constitution, Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913), would, if enacted in the same words today, without explicit legislative guidance from the debates, the committee reports, the exordium of the statute, and other ancillary sources, not easily hurdle the barrier of the Fifth Amendment, and comply with recent precedents requiring definiteness as a *sine qua non* of valid criminal legislation.

To satisfy both modern judicial susceptibilities, and increased awareness of the right of prospective defendants to clear warning of what constitutes criminal conduct, courts, while not abandoning the possible *in futuro* widening or deepening of the Sherman Act with the growth of experience, and while not sacrificing the possible stretch of the statute in the future to keep pace with any scheme hereafter developed to evade its deliberately prospective broad reach, have tended to lay down, especially in connection with § 1 of the Sherman Act, so-called *per se* rules, (as, for example, the rule invalidating price-fixing agreements made to cover a substantial market), which are relatively precise and which form the basis of virtually irrebuttable charges of violation of the Sherman Act. United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035; United States v. New Wrinkle, Inc., 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417. Such *per se* rules go beyond presumptions, burdens of proof, or like procedural measures. They are substantive glosses constituting clear corollaries.

With regard to § 2 of the Sherman Act, the trend has been less clear, and has reflected a greater degree of wariness or

timidity on the part of judges. Yet in the two decades since the opinion of Judge Learned Hand in United States v. Aluminum Co. of America, 2nd Cir., 148 F.2d 416 (1945), most of the cognoscenti have expected that a day would come when the Supreme Court would announce that where one or more persons acting jointly had acquired so clear a dominance in a market as to have the power to exclude competition therefrom, there was a *rebuttable* presumption that such power had been criminally acquired and was a monopolizing punishable under § 2. To be sure, the putative offender would be allowed to avoid or defeat this presumption if he bore the burden of proving that this share of the market was the result of superior skill, superior products, natural advantages, technological or economic efficiency, scientific research, low margins of profit maintained permanently and without discrimination, legal licenses, or the like. Cf. United States v. United Shoe Machinery Corp., D.Mass., 110 F.Supp. 295, aff'd 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910. Such a shifting of the burden not merely of going forward, but of proof, such a rebuttable presumption rest on the by-now dozens of court records which make it quite clear that it is the highly exceptional case, a *rara avis* more often found in academic groves than in the thickets of business, where monopoly power was thrust upon an enterprise by the economic character of the industry and by what Judge L. Hand in Aluminum called "superior skill, foresight and industry." More than 7 decades of Sherman Act enforcement leave the informed observer with the abiding conviction that durable nonstatutory monopolies (ones created without patents or licenses or lasting beyond their term) are, to a moral certainty, due to acquisitions of competitors or restraints of trade prohibited by § 1. They are the achievement of the quiet life after the enemy's capitulation or his defeat in inglorious battle.

 To this Court it appears that the day has come for it, and more important for counsel, to proceed on the ac-

knowledged principle that once the Government has borne the burden of proving what is the relevant market and how predominant a share of that market defendant has, it follows that there are rebuttable presumptions that defendant has monopoly power and has monopolized in violation of § 2. The Government need not prove, and in a well-conducted trial ought not to be allowed to consume time in needlessly proving, defendant's predatory tactics, if any, or defendant's pricing, or production, or selling, or leasing, or marketing, or financial policies while in this predominant role. If defendant does wish to go forward, it is free to do so and to maintain the burden of showing that its eminence is traceable to such highly respectable causes as superiority in means and methods which are "honestly industrial", as Judge Hand characterized the supposititious socially desirable monopolizer.

 One other preliminary point does deserve note—and that is the relevance, if such there be, of defendant's intent. The issue is whether when the Government or other plaintiff charges a defendant with violation of the Sherman Act the complainant is under a duty to prove that his adversary had either *mens rea* or, more than that, the specific intent to violate the antitrust Acts. So far as concerns a charge of "monopolizing", unlike the lesser offense of "attempting to monopolize", it is not necessary, as both Aluminum and United Shoe declare, for the complainant to prove more than that defendant intended to engage in the practices which maintained its market power. A defendant who monopolizes has "first of all * * * the intent to do the act, and secondly * * * a knowledge of the circumstances that make that act a criminal offense." Patrick [Lord] Devlin, lecture on "Statutory Offenses", republished in Samples of Lawmaking [London, 1962,] pp. 67–82, at p. 78.

### B. FINDINGS OF FACT

1. The gist of the Government's complaint is that defendants and co-conspirators (1) have been engaged in an unlawful combination and conspiracy to

restrain, and (2) an unlawful combination and conspiracy to monopolize, and (3) have attempted to monopolize, and (4) have monopolized, interstate trade and commerce in what the Government denominates "the accredited central protective service business."

2. The central station protective service (hereafter called "CSPS") business consists of maintenance of a central station, installation and maintenance of hazard detecting devices on the subscribers' premises, connection of these devices to the central station by wires leased from the local telephone company, and receipt and handling of alarms transmitted to the central station from the subscribers' premises.

3. CSPS, at present, involves customer concentration within specific areas. The chief reason is that alerted CSPS employees must promptly reach the scene of the alarm, and the present system does not have scattered task forces. Another reason is that high leased-line costs make it expensive to transmit signals for a great distance. Twenty-five miles from the CSPS central station has become the common radius. But this Court is not persuaded that, with the advance in technology, there are any physical obstacles, such as electrical resistance, which now stand athwart the geographical expansion of central station coverage whenever business advantage, competitive conditions, and prospect of favorable profits make the course expedient.

4. A central service station, in its normal daily service operations, is physically independent of any other central service station. As already noted, its service is summoned, responds, and is consummated usually within a twenty-five mile radius. This is *not* to imply that the ultimate supervision is not nationally directed; nor that the system of operations, nor that the equipment used, nor the checking of equipment, nor the reports about the system have a purely local, individualized character, origin, or destination. On the contrary, the enterprise in appearance and reality, in financing, selling, advertising, purchasing of equipment, processes of management, and over-all planning is national; though, of course, the impact, as is true of every enterprise, is upon local specific points.

5. By settled practice, universal in the insurance business, underwriters of fire and burglary insurance (hereinafter called "underwriters") allow a reduction of premiums to customers having approved protective signalling systems. To that end, underwriters have established testing laboratories, have adopted standards, have organized periodical inspections, and have offered premium discounts, of almost standard nature, based thereon. Discounts accorded to accredited central station service subscribers tend to be noticeably larger than for users of other systems.

6. When a prospective subscriber requests CSPS service, the service company surveys the subscriber's premises, determines the number and type of required protective devices, and estimates the cost of needed equipment and labor plus overhead·expenses and often expected profit, all of which are usually used in computing an "installation charge." This charge is normally payable upon completion of the installation. Additional "annual service charges", usually payable periodically in advance, and calculated with reference to the equipment in service, telephone line rental costs, expected service including maintenance costs, and often expected profit, are also charged to the subscriber. Annual service charges are covered by contracts for periods of up to five years. Such a contract normally provides that at its termination the service company has a right to remove the equipment without refunding money or making any other payment to the subscriber.

7. In 1961 ADT provided CSPS to 121 units, located, respectively, in 115 cities, which, in turn, were located, respectively, in 35 states and the District of Columbia. In 92 of those 115 cities ADT has no CSPS competition.

8. Holmes provided CSPS to 14 units, each located in one of 3 cities,—11 in New York City, 2 in Philadelphia, and 1

in Pittsburgh, in all of which it has CSPS competition.

9. AFA provided CSPS to 3 units, each located in one of 3 cities,—1 each in Boston, New York City, and Philadelphia, in all of which it has CSPS competition.

10. As of December 31, 1961 in the United States there were, in addition to the alarm company defendants, 33 CSPS companies approved by one or more underwriters. Of those, each of 5 provided CSPS from 2 locations; each of the remaining 28 provided CSPS from only 1 location.

11. Of those 33 CSPS competing companies, each of 7 operated in one of 7 cities without CSPS competition; each of 23 operated in one of 23 cities where it had CSPS competition from one or more of the alarm company defendants; 3 operated in cities where they had CSPS competition from others.

12. Business or other enterprises located in cities where there is CSPS have the option, of course, of using watchmen, watchdogs, automatic proprietary systems confined to one site, (often, but not always,) alarm systems connected with some local police or fire station, often unaccredited CSPS, and often accredited CSPS. There are business or other enterprises which in the same city exercise their options differently for different sites in that city. Thus, the Government itself in Washington uses at some public buildings a proprietary system; at others, accredited CSPS.

13. Examples of a particular enterprise changing from one alarm method to another are recited in the record; but, *significantly*, the preponderant shift is from the less integrated, advanced, expensive, and safe method of proprietary systems to accredited CSPS, thus indicating a customer recognition of a difference in market. This difference, to use a popular analogy, could be compared to moving into the class of the rich by changing from a compact six-cylinder car to a chauffeur-driven sedan. That is, there is a major product difference far transcending the obvious possible minimal cross-elasticity of demand.

14. It is also true that many central station companies, including defendants, furnish other forms of protection as well as accredited central station protective service. But this entry by one company into two or more adjacent markets has no substantial significance in defining either of these markets. Here a comparison may be drawn, by analogy, with the practice of General Motors Corporation in offering customers a choice of a chauffeur-driven Cadillac or a Chevrolet Corvair. General Motors caters both to "the Privileged and the People" who, in Disraeli's phrase, form "Two Nations."

15. In 1960 the alarm company defendants together with all other CSPS companies obtained from United States manufacturers in various states over $12,000,000 worth of protection equipment for installation. According to page 6 of the Reply Brief for defendants, ADT, Holmes, and AFA, all this equipment was "manufactured * * * by the defendants", (presumably overwhelmingly by Grinnell.)

16. In 1961 the alarm company defendants provided CSPS service to thousands of subscribers of whom more than 900 were each located in a state other than the one wherein the servicing station was located. For this type of service the charges in the previous year, 1960, had included $677,598.15 for interstate transmission of signals over wires.

17. Up to this point, most of what has been stated relates primarily to the 3 alarm company defendants which are themselves in the accredited CSPS business. Grinnell, which is not in that business, nonetheless manufactures the alarms, sprinklers, and other equipment which may be denominated the machinery of the business. It is the principal supplier of the dominant companies in the market. And its economic interest as a supplier stretches beyond the immediate purchasers, that is, beyond the alarm companies, to the subscribers for CSPS because, as will be recited in later findings, some of Grinnell's compensation

for its equipment takes the form of a share in the revenues received by the alarm companies from the fees paid to them by their subscribers.

18. Were it necessary to make such a finding, this Court would find that a primary motive of Grinnell when it acquired 89% of the capital stock of AFA, and 79% of the stock of ADT was to secure an assured outlet for part of Grinnell's manufactured products. Investment purposes were also a motive.

19. However, in courts, unlike on the stage, the drama need not concentrate upon the parties' motives. As explained in the Introduction to these Findings of Fact, the law does not require even proof of intent, much less proof of a motive, where the wrong charged is monopolization, as distinguished from an attempt to monopolize. Moreover, such intent as must be proved to sustain the charge of an attempt to monopolize, or a conspiracy to monopolize, relates to the purpose *to* monopolize, not to the purpose *of* the monopolization.

20. Hence, it is quite adequate to demonstrate that Grinnell by its mere acquisition of control of companies which in combination have 87% of the accredited CSPS market has shown by its actions that it is possessed by what the mediaevalists called "the lust for power." No doubt, that lust is often in modern times characterized by materialism, that is, by the search for economic advantage, including financial rewards and outlets for manufactured products. Here it is indeed probable that Grinnell's and its president's acquisition of leverage over the market for accredited CSPS was in part motivated by a desire to increase Grinnell's manufacturing business and to assure a quiet market as an outlet for the sale of Grinnell's alarms, sprinklers, and other equipment. Yet, just as the Government has no obligation to prove defendants' motives, so the Court is under no duty to make findings with respect to those springs of action. Speculation as to motives may be favored by playwrights, prosecutors, and jurors, but

judges do well to take in a Pickwickian sense Pascal's dictum that "the heart has reasons of which the reason knows not."

21. Grinnell's relations to ADT, AFA, and Holmes are in a formal sense so structured that each of the affiliates of Grinnell had separate officers, and separate boards of directors which have independent identity. But the form is not a true mirror of the substance of the interrelation of the 4 companies.

21a. Since 1919 the balance sheets of Grinnell, submitted as part of Grinnell's reports to its stockholders, have shown, though in unconsolidated form, the results of the operations of all 4 defendants.

22. Since 1948 the president of Grinnell has been James Douglas Fleming, a man who joined Grinnell in 1919, and whose competence, character, and force of leadership stand revealed throughout the whole record, and most particularly in the testimony he candidly gave in open court. Until 1964, he stood in lonely eminence; there were no vice-presidents of Grinnell; nor others who had more than a closely delegated authority. A purely nominal change has been made in the current year. Four men who had been with Grinnell for 30 years but who had no other independent distinction were named vice-presidents.

23. Mr. Fleming, in addition to being president of Grinnell, sits upon the board of directors of each of the 4 defendants; and is chairman of the board of ADT. There is only one fellow director of ADT who is not an officer of Grinnell or of ADT. The situation is not noticeably different in any of the affiliated companies. In only one instance that Mr. Fleming could recall, has a board of directors of one of the affiliated defendants ever vetoed, or rescinded, or overridden any of his or Grinnell's management proposals or plans. In all major operations of all 4 defendants Mr. Fleming has illustrated the Emersonian proverb that "where MacDonald [or, as misquoted in the record (Tr. 732) MacGregor] sits, is the head of the table."

24. The personnel unity achieved through the dominant character of Mr.

Fleming is buttressed in many ways. Under allocation agreements, executed in 1907, Grinnell as late as 1960 received over $1,200,000 from revenue produced by contracts made by its affiliates with one or more of the subscribers located in one or more of the 35 states and the District of Columbia. This sum was related to the same type of revenue which in the next year, 1961, produced for ADT, AFA, and Holmes more than $57,000,000 on account of CSPS charges those companies rendered to 93,272 subscribers located in 35 states and the District of Columbia.

25. Moreover, there is a generic similarity, though not an identity, in the contract forms, price lists, and instruction forms used by the 3 alarm company defendants. Many examples of each of these documents are sent regularly from the principal or home offices of the 3 alarm company defendants across state lines.

26. Furthermore, across state lines move to the principal or home offices of the alarm defendants reports, proposed contracts, payments, and other communications. Travel from one state to another on company business takes a substantial part of the working time of the principal officers of each of the defendants. This travel as well as the written communications produce a high degree of integration of the major policies of the 3 alarm company defendants, and result in effective control by Grinnell and by Mr. Fleming of all 4 defendants, their company subdivisions, their district sales offices, and their personnel.

27. In considering what is the relevant market, or what are the relevant markets, of interstate commerce, many of the factors heretofore detailed require consideration.

28. From the viewpoint of the type of service or product, the relevant market is not, as defendants contend, all protective systems, ranging from individual watchmen on the premises to the elaborate accredited central station alarm systems typified by the alarm company defendants' activities.

29. Quite plainly, non-automatic systems differ not merely in technology but in utility, efficiency, reliability, responsiveness, and continuity from all automatic arrangements. The difference between watchmen and watchdogs, at one end of the spectrum, and electrical systems at the other lies at the very heart of what is meant by such phrases as "the industrial revolution", "the machine age", "technological advance", and the "era of automation." Antitrust judges in their employment, no less than unskilled workers in their unemployment, recognize that markets for services rendered without tools and without education in the handling of them differ *toto mundo* from markets for services related to machines.

30. Nor, from the viewpoint of the type of service or product, can it be validly maintained that the relevant market embraces all automatic systems, including not merely accredited CSPS, but also local, auxiliary, and proprietary alarms and alarm systems unconnected with accredited central stations.

31. The accredited central station business is marked out by the very patterns of the alarm company defendants, who are the dominant factors in the protective industry, as being an identifiably separate market. Illustrative are the subscriber contracts with their installation and annual charges.

32. Many (though by no means all) of those who are engaged in the alarm company business, speaking in their capacity as experts (not necessarily with the special added status of authorized spokesmen making vicarious admissions binding defendants) have in correspondence and orally shown that that portion of informed opinion which this Court regards as the more credible recognizes the accredited central station business as a separate type of business.

33. Insurance companies allow their insured a far larger reduction of premium for accredited central station service than for other types of protective service. The annual charge paid by customers is several times as much for accredited central station service as for

proprietary systems, and more than for any other types of protection service.

34. There are trade associations uniting under one roof accredited central station protective service companies, and not including the generality of all types of automatic alarm systems.

35. As already noted, customers regard a change from proprietary alarms to CSPS as an entry into what is qualitatively and monetarily a new class, as when one changes from a Volkswagen to a chauffeur-driven Rolls Royce, or from a boarding house to a hotel named in a hotel association listing.

36. Hence, for purposes of the antitrust laws there exists a specific, separate, identifiable, recognized market limited to accredited central service protective systems operated by largely automatic devices.

37. If the market, product-wise, be plainly defined as limited to accredited central station protective service connected with automatic devices, it is hardly less clear that, geographically, because of the very nature of those automatic devices and the services related thereto, and the patterns in which that industry has developed, the market has a national interstate-commerce character.

38. It is not merely a congeries of segregated local or city markets. Of course, in addition to the principal national market, there may well be local markets of limited territorial area, or city markets, which in other litigation might be found in themselves to constitute, for purposes of the antitrust laws, definable, separate markets, wherein prohibited monopolies, or prohibited monopolization, or prohibited restraints, or prohibited attempts to achieve those forbidden ends might be enjoined or punished. But regardless of such local or city markets, there exists a national interstate commerce market in accredited Central Station Protective Services.

39. The existence of a national market is underlined by defendants' own national pattern of business, with its close articulation of control from the pinnacle of Mr. Fleming down the whole range of subordinate officers, and with its constant use of interstate commerce involving equipment, officers, salesmen, correspondence, even to an appreciable extent electric current carrying alarm signals from one state to another.

40. A fire or burglary may be local. Alarms may be sent to a point only a few blocks away. Relief may be dispatched from a local fire or police station. But the system of accredited CSPS rests upon the far-flung structure (a) of national planning, (b) of lapsed agreements covering activities in many states, (c) of inspection, certification, and reduction of rates by national insurers, (d) of defendants' national schedules of prices, rates and terms, and (e) even, on occasion, of national special discount prices to a particular customer who operates multi-state enterprises.

41. Grinnell and the affiliated companies included in its balance sheet do not pretend to have a purely local status when they solicit customers, or report to stockholders, or raise funds for their business purposes, or advertise their merits, or preen themselves on their conspicuous success.

42. When all the rest can see a typical American national business enterprise flourishing in an interstate market, federal courts too get the signal and can hear the alarm sounded when such a market is subject to restraint of trade or monopolization.

43. From the foregoing detailed facts there emerge as ultimate facts, found by this Court, first, that as the complaint alleges, "the business of supplying and installing protection devices on the premises of subscribers, maintaining such devices and furnishing to subscribers protection from fire, burglary, or other hazards, through central stations accredited for such service by insurance inspecting and rating organizations" is a trade or industry which constitutes part of the commerce among the several states subject to regulation by Congress under Article I, Sec. 8, cl. 3 of the United States Constitution, and indeed regulated by

Congress by virtue of the Sherman Act, and second, that the accredited CSPS business which is performed by each of the 3 alarm defendants and is controlled by defendant Grinnell is, likewise, part of interstate commerce subject to Congressional regulation and indeed regulated by the Sherman Act.

44. During the period 1957–61 defendant alarm companies' share of the total national accredited CSPS market ranged from 87% to 91%; and ADT and Holmes had 87% to 90% of so much of the central station burglar alarm business as was "certificated" by all underwriters' laboratories.

45. However, it is only fair to add that from 1957 to 1961, defendant alarm companies' shares of central station subscribers and of revenue therefrom showed a slightly declining trend. Moreover, there is no persuasive evidence that any particular prospective entrant has been unable to begin operations, or that any specific CSPS firm has failed or been driven out of business. The most that can be said is that some competitors complain of what they regard as unsatisfactory profits.

46. Defendant alarm companies do not have unfettered power to control the price of their services. Even where they have no competition from other CSPS companies, they have not always been able to receive the standard they have set for themselves, the so-called "Minimum Basic Rates", (hereafter called "MBR") or annual service charges. This is due to the fringe competition of other alarm or watchmen services.

47. Yet this ceiling imposed by fringe competition and this implied cross-elasticity of demand lose almost all their significance when set against the fact that, because of their national operations, one or more of defendant alarm companies choose in some areas to operate at a loss. ADT's own counsel, in both brief and oral argument stressed, paradoxically, that it operated 20 *"deficit"* offices in cities with no other central station. Counsel seem not to appreciate that this fact is a strong point against defendants. It conclusively proves that defendants enjoy national monopolistic power which permits one of the conspirators to occupy local markets where no independent CSPS station would long function and to extend to each of them the combination's national monopolistic control. *Hardly any indicium of monopoly power is more persuasive than the continued capacity of the asserted monopolistic combination to sustain offerings at a loss either in particular areas or in particular services or products.*

48. Defendants faced with proof of the overwhelming share of the accredited CSPS business in the hands of the alarm company defendants have offered no evidence to rebut the presumption that this share was the result of an attempt to monopolize and have not sought to maintain their burden of proving that their share is attributable primarily to their skill, efficiency, and foresight, or to like factors of obvious social utility. On the contrary, the evidence rather plainly indicates that acquisitions, both within and outside the relevant market, were important sources of the market power achieved by the alarm company defendants.

49. ADT purchased in 1946 for $282,-395.02 Reliance Alarm Co., a Detroit company. In 1955 ADT acquired for $300,-000 General Alarm Corp. of Boston. It is true that before making the latter purchase ADT informed the Department of Justice; but it is incontrovertible that whatever else the Department's silence indicates, no inference can be drawn that the Department had, or attempted to exercise, authority to treat that disclosure as proof that ADT was growing larger by virtue solely of its skill, efficiency, foresight, or like factors of obvious public benefit. Nor did the Department of Justice suggest that when after acquiring General Alarm Co. of Boston, ADT dismantled it, ADT failed to reveal in the most flagrant way its intent to attempt to monopolize.

50. The Detroit and Boston concerns just mentioned operated approved central

station protective systems when they were acquired. Other companies which did not operate such systems and hence admittedly were not in the market directly at issue in this case were also acquired by ADT. In its answer ADT admitted that it acquired 22 protection companies. Going further, ADT's counsel at p. 9 of their Reply Brief admit that ADT purchased and dismantled in 1913 the Still Alarm Co., Cleveland, and in 1959 Federal Automatic Alarms, Albuquerque; and that ADT in 1954 purchased the subscriber equipment of Globe Electric Protection Company, Atlantic City. What is significant is *not* that those 3 concerns fall within or without the relevant market here in issue, for plainly they fell outside that market, but that the acquisitions indicate that ADT's growth, far from being attributable solely to superior techniques and methods of administration and like so-called honestly industrial means, owes more than a little to the special kind of appetite which has characteristically revealed a monopolistic temper and explained a monopolistic growth.

51. It is unnecessary to pause for elaborate description of the other acquisitions of ADT or Holmes or AFA, if any, or of the occasional accompanying covenants by sellers not to compete with the alarm company defendants. Enough has been noted to see why it is that defendants have not borne, and cannot bear, their burden of showing that their proportion of the market is a mere tribute to their perfect performance.

51a. Another significant factor in defendants' growth in the share of the national market were the, by-now lapsed agreements during the period 1904–1954 between the alarm company defendants before they were affiliated, or between alarm company defendants and actual or potential competitors. Those agreements provided for the orderly allocation of geographic areas and classes of CSPS. Though the agreements are no longer legally effective, their influence in forming business patterns remains to a discernible extent.

52. One of those agreements was the Burglar Alarm Agreement of September 28, 1906 between ADT and Holmes, then unaffiliated. ADT conveyed to Holmes all burglar alarm business, including subscriber contracts and installed devices, in New Jersey, Maryland, Delaware, the District of Columbia, 8 counties of New York (New York, Richmond, Kings, Queens, Nassau, Suffolk, Westchester, and Rockland), 6 counties in Pennsylvania (Philadelphia, Delaware, Chester, Montgomery, Bucks, and Allegheny), and so much of Connecticut as lies within 33 miles of New York City. In those areas ADT agreed forever to refrain from engaging in central station burglar alarm service. Holmes agreed forever to refrain from engaging in any type of protection service outside of those areas; and within those areas to limit itself to burglar alarm service, and, in the case of financial institutions, to nightwatch service. Most of the pattern thus established continued, without legal buttress, at least until this suit was brought,—for, as of December 31, 1961, Holmes did not render service outside of the defined area; nor within the area did it serve a single central station fire alarm subscriber.

53. Another series of agreements were the Fire Alarm Agreements of April 29, 1907 among Grinnell, ADA, AFA, and the non-defendant Automatic Fire Protection Company (hereafter called "AFP"), all then unaffiliated. (a) AFA received an exclusive right to contract with subscribers for central station sprinkler supervisory and waterflow alarm service (hereafter called "SSWF") for Greater New York, Philadelphia, and Boston and Charlestown, Massachusetts. AFA agreed to refrain from engaging in nightwatch and burglar alarm service in those four cities, and to refrain from all other types of CSPS elsewhere in the United States. (b) AFP received an exclusive right to contract for SSWF service elsewhere than in the 4 named cities. (c) ADT received the exclusive right to render nightwatch and burglar service throughout the United States, and agreed to permit AFA and

AFP in their respective territories to connect SSWF alarm service to ADT's central stations. (d) Grinnell agreed to furnish all SSWF alarms for contracts obtained by AFA and AFP, and itself to refrain from invading the assigned territories. (e) Among the 4 named companies provisions were made for AFA to receive 25% of the SSWF alarm revenue from its territory; ADT to receive 50% of the SSWF alarm revenue from both AFA and AFP territories; and Grinnell to receive 25% of the SSWF alarm revenue from both AFA and AFP territories. January 1, 1949 ADT purchased all AFP's rights under the agreements. Much of the pattern established under the 1907 agreements continued, without legal buttress, at least until this suit was brought,—for, as among defendants, ADT continues as the exclusive source of central station nightwatch and burglar alarm service, AFA as the exclusive source of central station nightwatch and burglar alarm service, AFA as the exclusive source of central station fire alarm service in New York, Philadelphia, and Boston; and Grinnell does not furnish the types of service originally precluded by the 1907 agreements.

54. Grinnell and ADT and the Rhode Island Electric Protective Company (hereafter called "RIEP") have agreed that RIEP shall have the exclusive right to render CSPS within Rhode Island, at prices not less than those established by ADT for like service, and with certain devices supplied by Grinnell. RIEP shares its revenue with ADT and Grinnell. This agreement is presently effective. Admittedly this relationship is a mere makeweight in indicating Grinnell's and ADT's role in controlling the approved CSPS market, its monopolistic power therein, and its intent to monopolize.

55. Although defendants have a "Schedule of Minimum Basic Service Charges" and "ceiling prices" which constituted their standard rates, they depart therefrom when they encounter actual or threatened effective competition. Departures have included (a) frequent quotation of prices with an annual service charge less than 100% but not less than 80% of the minimum basic rate, and with an advance service charge less than 100% but not less than 60% of the minimum basic charge, (b) occasional installation of CSPS without charge, (c) rarely, successive bids each, progressively, lower than the so-called standard minimum basic rates, (d) at least once, the reduction of rates at all locations of a chain-business account to preclude a competitor of defendants from securing in one city an account of that chain, and (e) infrequently, the deferment of prompt payment of installation charges. Sometimes these departures have merely met the prices of competitors; but, on other occasions, rare though they were, the departures undercut or beat competitors' prices.

## C. CONCLUSIONS OF LAW

■ 1. From the foregoing findings of fact it is transparent that during their growing period the alarm company defendants in several respects violated the restraint of trade provisions of Section 1 of the Sherman Act.

■ 2. The alarm company defendants engaged in *per se* violations of Section 1 when they, being the most substantial and the recognized dominant enterprises in the CSPS industry, entered into written agreements, now admittedly several decades old and formally no longer effective, which allocated geographic markets and classes of customers and fixed minimum prices for types of service. Grinnell formally took a share directly or indirectly in the revenues from these agreements. When the agreements expired, defendants, including Grinnell, continued most of the arrangements once founded on those unlawful legal instruments.

■ 3. Because of the formal expiration of the agreements, it, *conceivably*, might be too late for the Government now to seek against defendants relief from the legal instruments as such. But the folds in the industrial scene have remained even though the technical pres-

sure of the legal instruments has been withdrawn. Channels of activity begun under legal formalities became habitual, and, even after the formalities had expired, in most cities have continued to carry the same menace to free trade. Injunction against continued adherence to the patterns formed in violation of law is not merely appropriate but necessary to accomplish the declared objects of the antitrust laws.

4. Furthermore, the alarm company defendants resorted to restraints of trade prohibited by Section 1 of the Sherman Act when, faced with competition, they, being in a dominant position, manipulated their own prices to forestall competition. Injunction against pricing discriminatorily utilized by a monopolistic combination to forestall competition is appropriate and necessary.

5. The restraints of trade just mentioned were a chief avenue by which the alarm company defendants previously attempted to monopolize, and do monopolize and now do conspire to monopolize, the national market in the accredited CSPS industry, all in violation of Section 2 of the Sherman Act.

6. Perhaps even more effective as a means used to attempt to monopolize, and eventually to monopolize, the industry, in violation of Section 2 of the Sherman Act, were the alarm company defendants' acquisitions of competing companies, more particularly in the light of the dismantling of some of the acquired service stations.

7. Grinnell's acquisition of so high a percentage of stock of the companies engaged in the monopolization, and Grinnell's direction of the policies of the 4 companies as a whole toward the maintenance of the monopolization constituted a violation of Section 2.

## D. OPINION ON LIABILITY

1. At this late date it is hardly necessary to do more than briefly recapitulate what is meant in Sherman Act parlance by the concepts "to attempt to monopolize", or a "conspiracy to monopolize", or "to monopolize."

2. To succeed in a Section 2 case plaintiff must prove that the putative monopolist or monopolists sought to achieve or achieved the economic power, even though unexercised, to control prices or production in a relevant market, or to exclude competition therefrom. Proof may be direct or indirect.

3. One indirect method to prove the requisite power is to show defendants' occupancy of an overwhelming (but not mathematically definable) percentage of the market, unless that position,—or, as it is called, "share of the market",—is shown by the supposed monopolist to be attributable exclusively to his skill, efficiency, foresight, or like affirmatively laudable business conduct. Unless he maintains the burden of proving himself within the exception, the occupant in the dominant position stands condemned.

4. What degree of occupancy, what share of the market, are indicative of monopolistic control depends on a judgment based upon all aspects of the particular market under review. But while close cases can be supposed, no informed student of prior decisions involving Section 2 of the Sherman Act could doubt that on this record defendants occupy a share of the CSPS market far beyond the line justifying a presumption of monopolistic power. The percentage is so high here as to need no explication. And, as the conclusions of law already set forth state, this share of the market rests not on the skill, efficiency, and foresight of defendants, not even on their neutrally normal business methods, but on violations of *per se* rules governing restraints of trade and on acquisitions indicating that that growth was a response to external grasp, not to internal grip.

5. Nor in this case need we consider whether there are present all the various policy considerations advanced from time to time by legislators, judges, and academicians to justify or interpret the antitrust prohibition of monopoly.

6. Of course, in the relatively small accredited CSPS industry it would be nearly ridiculous to rest the present ap-

plication of the Sherman Act upon a literal interpretation of the economic and philosophical postulates offered in great antitrust cases in celebrated opinions by Mr. Justice Brandeis, Mr. Justice Black, Mr. Justice Douglas, Mr. Justice Brennan, or Judge Learned Hand. Here we are dealing with an industry which as a whole involves fewer individuals and less capital than, let us say, any one of the three leading manufacturers of automobiles, of steel, or of electronics, or any one of the three largest chain retail store systems, insurance companies, or banks. The activities of Grinnell and its affiliates, no matter what their intent or their achievement, could hardly be said to have a significant potential effect comparable to those giants' maneuvers in, at least by possibility, dwarfing men, or interfering with their creative, political, or spiritual possibilities, or determining their economic fate, or depriving them of the illusion or reality of free choice in an open society.

7. What justifies this application of Section 2 of the Sherman Act to these defendants is not avoidance of "the curse of bigness", or the fear that men will be converted into robots, or the dread that society will be stratified into trusts more burdensome than feudalism, or colonialism, or socialism, or communism, or some other despised polity, or a concern lest giants larger than the state itself shall lead us into tyranny or into the need of a socialistic regimen as an antidote to private despotism.

8. It is even doubtful whether we can say that here we have the danger of a business becoming slothful, routinized, sleepy, or wanting in alertness, initiative, and progressiveness, as a result of the quiet life sought and usually achieved by a monopolist.

9. Nor can it be truly asserted that here we are faced in microcosm with Acton's fancied or real disease,—the corruption of power. Mr. Fleming and his associates are not likely to be on anyone's list of Napoleons. Nor is Grinnell's corporate power "corrupt" or "imperial."

10. In cases like this where the Sherman Act ban against monopolizing is invoked against defendants who have secured dominance of a small industry by imposing unlawful restraints of trade and by a steady stream of acquisitions of competitive enterprises, the usual rhetoric is quite out of place. All that is at stake here is the rooting out of a plant of minor importance in the rich forest of the American economy, not because it overshadows all of us, or even many of us, but because it represents an ultimate growth from seeds which have been declared unlawful. Congress in Section 1 of the Sherman Act outlawed the means and in Section 2 outlawed the end achieved by those means.

11. In most, though not all, situations relief against the monopolization forbidden by Section 2 could be achieved through a proceeding under Section 1 couched in the form of an attack on restraints of trade. But this is not always true. Proceedings under Section 1 may come too late: for example, the formal restraints may have been withdrawn, or laches may have intervened, or, as in United States v. United Shoe Mach. Corp., D.Mass., 110 F.Supp. 295, hoary precedents sustaining as valid what the current law now regards as undoubted restraints of trade may preclude the Government from securing an injunction against the restraints as such. Yet though the Government may be barred from getting under Section 1 relief directly against the restraints, it may, nonetheless, under Section 2 get relief against the consequences of the restraints if, but, of course, only if, they have gone so far as to involve a continuing monopolization. Having failed to nip the bud, the Government may still pluck the flower of evil.

### E. OPINION ON REMEDY

1. Even if this is not a "big case" in any sense (except in the Government's unnecessary volume of exhibits disclosing chiefly the Department of Justice's unwillingness to accept the notion that in the second half of this Century, lower Courts, educated by the Supreme Court,

can get the point that an antitrust case really turns on a relatively manageable set of facts, on a few by-now clear legal issues, and on a presentation worthy of Mr. Justice Holmes' advice to "Strike for the jugular"), nonetheless, the findings of fact and the conclusions of law demand a decree of scope and strength.

2. This is no border-line case. A man of the capacity, sophistication, and, possibly, risk-taking temperament of Mr. Fleming cannot have been ignorant that the companies he controlled had in the most flagrant way violated the clearest aspects, the so-called *per se* rules, of the Sherman Act and were continuing to follow patterns conceived in crime. Maybe he shrewdly weighed business advantage against business disadvantage, and with keen appraising eye estimated the law's delays, the fluctuating policies of the Department of Justice, the improbability of private suitors with adequate funds and resolution, the reluctance of courts to apply surgical measures to cut deep into already established industrial patterns, and, in any event, the plausibility of the oft-cited, if strangely inapt, metaphor that one cannot unscramble eggs.

3. Whatever may have been the calculation of defendants or their officers, this Court has determined that this case requires a three-pronged judgment adequate to uproot the evil of a long-effective monopolization.

4. First, defendants, including the controlling Grinnell Corporation, shall be specifically directed to cease and desist from restraints of trade in which the record shows that the alarm companies have engaged directly or indirectly. This decretal provision rests expressly on the ground that the restraints were from their first imposition a violation of Section 1, and, alternatively as well as cumulatively, on the ground that they are a continuing cause of the monopolizing prohibited by § 2 of the Sherman Act. To make effective this cease and desist order which, *inter alia,* precludes the alarm company defendants from manipulating prices and terms of sale or servicing so as to bring against competitors defendants' monopolistic power, the alarm company defendants shall be required, until further order of the Court, to file with the Antitrust Division of the Department of Justice such *standard* lists of prices and terms of sale or servicing as, *at their uncontrolled pleasure,* they from time to time adopt, and also to file a record of every quotation, written or oral, departing from those standard lists, such filing to reach the Division within two weeks of the quotation. It is not the purpose of this direction to give the Government the right to fix or even to object to any alarm company's standard price list. It may select any figures it likes. And at any time it may change the standard schedule, if this is done for all customers of like kind. But if an alarm company defendant seeks to depart in individual instances from its standard schedule, then it must report the departure and run the risk of being charged with invidious, illegal discrimination. The cease and desist order shall prohibit each defendant from acquiring the stock, assets, or business of enterprises in the accredited CSPS industry. External growth is the badge of the monopolist, as internal growth is the mark of the free life.

5. Second, no later than April 1, 1966 Grinnell shall file with this Court a plan of divestiture under which it shall dispose of all of its stock in each of the other defendant companies. Such plan may, at the election of Grinnell, provide for the stock to be sold, or for the stock to be distributed to shareholders of Grinnell, or for some combination or reasonable variation of those two methods. The date is purposely set far ahead to permit an appeal to the Supreme Court, and to let defendants consider all tax and corporate problems.

6. Third, to insure that the reforms imposed by this decree are not thwarted by a leader of great capacity but of less than an admirable record of compliance with well-known prescriptions of antitrust law, and to guarantee that there is an entirely effective breaking-up of the channels of restraint and monopolization

which the present management of Grinnell has dug so deep into the pattern of the accredited CSPS industry, and to make certain that the general public is not further prejudiced by the continued management of defendants by one who has demonstrated defiance of legal prohibitions, no defendant, after April 1, 1966, shall continue in employment as officer, director, employee, consultant, agent, or otherwise James Douglas Fleming; but nothing herein shall preclude any defendant from fulfilling any pension or like purely financial agreement it now has with Mr. Fleming. Full notice that this Court contemplated this decretal provision was given to defendants by this Court during the trial and on the very day when Mr. Fleming gave his extensive, uninterrupted account of his role in the conspiratorial combination. This provision shall not be construed as in any respect retroactive or punitive; its interpretation shall be strictly prospective and prophylactic; nor shall it be regarded as directed against Mr. Fleming, but against defendants' use of Mr. Fleming, the leader who brought them to this end and cannot be expected to regard a reversal of his policies as suitable marching orders. While this Court does not feel that it can leave Mr. Fleming in the saddle, there is intended in this decretal provision, or in any other part of this opinion and judgment any suggestion that Mr. Fleming lacks financial integrity or honesty of the usual type. He is an "honest man" after the manner of Theodore Roosevelt or Norman Hapgood. See Learned Hand, on Robert P. Patterson, in THE SPIRIT OF LIBERTY ed. by Irving Dilliard, [Vintage Books, N.Y. 1959 ed.], pp. 200–208, at page 205. He is undoubtedly a man whose virtue the Scotch would appreciate, and of a VIRTU the Italians would applaud. But he appears on this record to have been for well over a decade and a half the vigorous captain of the defendants' conspiracy to monopolize.

Judgment in accordance with findings of fact, conclusions of law, and opinions on liability and remedy.