**BOWL AMERICA INCORPORATED, Bowl America Odenton, Inc., Dundalk Ten Pin Bowl, Inc., Bowl America Cedonia, Inc., Glen Burnie Ten Pin Bowl, Inc., Reisterstown Bowl, Inc., Glen Burnie Bowl, Inc., B. A. Restaurant, Inc., N. A. Bowl, Inc., Bowlers Restaurant, Inc., all bodies corporate duly incorporated under the laws of the State of Maryland.**

v.

**FAIR LANES, INC., Fair Lanes Colt Properties, Inc., Colt Lanes Holding Company, Inc., Sidney M. Friedberg and R. Stuart Armiger.**

Civ. No. 18093.

United States District Court
D. Maryland.

May 6, 1969.

Supplemental Opinion June 9, 1969.

Stanley H. Wilen, Burke, Gerber & Wilen, Baltimore, Md., Wm. Warfield Ross, Donald H. Green (Joel E. Hoffman and Alexander W. Sierck, on the brief), Wald, Harkrader & Rockefeller, Washington, D. C., for plaintiffs.

Arthur Machen, Jr., Venable, Baetjer & Howard, Baltimore, Md., Victor H. Kramer, Bruce L. Montgomery, Arnold & Porter, Washington, D. C., for defendants.

THOMSEN, Chief Judge.

This private antitrust action under 15 U.S.C.A. § 15 seeks damages and injunctive relief against the largest chain of bowling establishments in Metropolitan Baltimore based upon alleged anticompetitive activities, principally in 1964, when defendants acquired the eight bowling establishments of its then-largest competitor. Those acquisitions—together with related acts claimed to have had the purpose and effect of restraining or destroying competition, and of injuring plaintiffs as potential and actual competitors of defendants in the operation of bowling establishments—are charged as violations of §§ 1 and 2 of the Sherman Act,[1] 15 U.S.C.A. §§ 1, 2, section 7 of the Clayton Act, 15 U.S.C.A. § 18, and the common law of Maryland.

The following terms will be used in this opinion:

"Bowl America" to mean Bowl America, Inc., together with its wholly-owned subsidiaries, including all plaintiffs in this case;

"Fair Lanes" to mean Fair Lanes, Inc., together with its wholly-owned subsidiaries, including the corporate defendants;

"Defendants" to mean all defendants, individual as well as corporate;

"Bowling establishments" to mean any facility for tenpin or duckpin bowling open to the public, together with related facilities for serving food, selling bowling supplies, etc.;

The "bowling business" to mean the operation of one or more bowling establishments;

"Metropolitan Baltimore" to mean the area from the center of the City of Baltimore to eight miles beyond the Baltimore Beltway;

The "five Bowl America establishments" to mean the houses at Cedonia, Dundalk, Glen Burnie, Odenton and Reisterstown, which were operated by Bowl America until July 1963 and again after June 1964;

The "three Colt establishments" to mean the Colt houses at Dundalk, Towson and Woodlawn;

The "Colt Chain" to mean the three Colt establishments, and the five Bowl America establishments during the period in 1963–64 when they were operated by the Colt organization;

"The Colt organization" to mean: (1) Colt Lanes, Inc., controlled by George E. Banks, III, in 1963, which owned (2) the corporations which operated the several Colt establishments; (3) Colt Realty Inc., controlled by Banks, which owned, subject to mortgages, the leasehold interest in the real estate and had a substantial investment in the buildings occupied by the three Colt establishments; and (4) Colt Pinsetter Company, a part-

---

1. Section 3 of the Sherman Act is also cited, because plaintiffs claim that some commerce between the District of Columbia and one or more states was affected.

nership controlled by Banks, which owned an interest in and leased pinsetting equipment to the operating companies of the three Colt establishments;

"Bowling equipment" to mean pinsetting equipment, bowling lanes, scoring devices, seats, furniture, carpeting and snack bar equipment;

"Bowling supplies" to mean pins, balls, shoes, bags and trophies;

"Modern bowling establishments" to mean large, brightly-lighted, air conditioned, carpeted, free-span structures with elaborate automated machinery for pinsetting, ball-returns and scoring. They usually provide restaurants, nurseries for infants, and spacious parking areas. Some modern establishments provide only tenpin lanes, some only duckpin lanes, and some both.

"Lineage" to mean the total number of games bowled by all bowlers.

### Historical Facts [2]

Bowlers, whether duckpin or tenpin, fall into two categories: "casual" and "league". League teams usually bowl each week at scheduled times pursuant to agreements with the establishments ("league contracts").[3] The operation of bowling establishments is a seasonal business, with a decline in the late spring and summer months. Air conditioning has mitigated but not eliminated this characteristic.

Fair Lanes began operating bowling establishments in 1923 in Baltimore, and grew over the years by building new establishments and acquiring existing ones. It has always been the leader in the number of establishments, lanes and lineage in Metropolitan Baltimore. It has repeatedly characterized itself as "dominant", as well as "preeminent" and "leading". Its officers, including the individual defendants, have repeatedly sought to bar, discourage or drive out others trying to enter those areas in the Metropolitan Baltimore bowling market which Fair Lanes wished to appropriate for itself. Fair Lanes has also extended its activities to other markets, including Metropolitan Washington and North Carolina.

In 1959 and 1960 there was a bowling boom in the United States. Many modern bowling establishments were built and chain operations became common. Most of the modern establishments in Metropolitan Baltimore were built in the suburbs near the Beltway between 1959 and 1962. The increasing mobility of society, reflected in part by the Beltway, broadened the geographic area from which bowling establishments drew their customers.

Bowl America entered the bowling business in 1959 in Metropolitan Washington. Between 1960 and 1962, it built five modern bowling establishments in Metropolitan Baltimore. At about the same time, three modern establishments were built in Metropolitan Baltimore by the Colt organization. In May 1963 Fair Lanes was first, Bowl America second, and Colt third in the operation of bowling establishments in Metropolitan Baltimore.

The bowling business peaked around 1961, slumped badly in 1962 and continued to decline for several years thereafter. Too many bowling establishments had been built too fast. Brunswick and AMF, the principal suppliers of bowling equipment, had been very liberal in their credit policies and took severe losses. Repossessions and bankruptcies occurred

---

2. Many proposed findings of fact were submitted by plaintiffs and by defendants. If there is any conflict between the Court's rulings on those proposed findings and the facts as stated in this opinion, the statements in the opinion are intended to control.

3. Bowling leagues are usually organized groups of three to five-man (or woman) teams from industrial plants, businesses, social organizations, churches, and clubs. Leagues are also organized by the managers of bowling establishments from casual bowlers among their patrons. Bowling establishments also sponsor tournaments in which teams representing different leagues, frequently from establishments in other parts of a metropolitan area, compete.

with increasing frequency. Fair Lanes' financial resources gave it the power to acquire competitors whose finances were insufficient to carry them through depressed periods, and it made the exercise of that power a policy of its business.

Early in 1963 Fair Lanes negotiated with Banks, hoping to acquire the three Colt establishments. Banks, however, decided to expand his operations and proposed to Bowl America that the Colt organization acquire the five Bowl America establishments in Metropolitan Baltimore. Those establishments, as a group, had never operated at a profit, and Banks' desire to expand the Colt operation coincided with Bowl America's wish to ease its cash shortage.

Accordingly, on May 15, 1963, Bowl America agreed to transfer to Colt Realty, Inc., or its designees, the assets and liabilities of the five Bowl America establishments. Colt Realty agreed: (a) to pay $233,350.08,[4] of which $85,000 was to be paid at settlement and the balance over a period of time; (b) to pay all future liabilities under the real estate leases of the five establishments; (c) to produce a certified balance sheet showing that its net worth was at least $500,000; and (d) to obtain, before the settlement, releases from four of the five Bowl America landlords, relieving Bowl America from further liability to those landlords, or, alternatively, to provide Bowl America with a $200,000 second mortgage on the three original Colt leaseholds.[5]

Shortly thereafter Banks told plaintiffs that he had been unable to arrange the second mortgage. He proposed, as a temporary measure of security, in lieu of the releases and mortgages, that he, his wife and Colt Realty would sign an agreement personally to indemnify Bowl America in the event any liability on the leases was enforced against Bowl America. That assurance was accepted.

On July 1, 1963, the five Bowl America establishments were taken over by five subsidiaries of Colt Lanes, Inc., as designees of Colt Realty. The $85,000 was paid to Bowl America and it made current all obligations of the five establishments. Bowl America was released by Brunswick and AMF, among others, from primary liability on a number of conditional sales contracts for bowling equipment in the five Bowl America establishments, but it never received either the releases from the Bowl America landlords, or a second mortgage on the Colt leaseholds. Nor did Bowl America ever receive the promised certified balance sheet, or make any inquiries of Colt Realty or Banks concerning Colt Realty's ability to pay its obligations as they became due.[6]

Until early in 1964 Banks, although frequently late, met the obligations of the five Bowl America establishments, except state taxes. In February 1964 Bowl America's president met with Banks. Notwithstanding Banks' continued failure to obtain releases to Bowl America from the landlords, Colt's increasing defaults, and Bowl America's awareness that Banks himself was in financial difficulties, Bowl America agreed not to "move in and throw him out". Banks in turn tentatively agreed to provide Bowl America with a second mortgage on the Colt establishment in Dover, Delaware, but he never provided that mortgage. After the February 1964 meeting, the defaults of Banks and his companies continued and worsened. The books of original entry for the Colt

---

4. Which was 40% of the net equity, a reasonable price. Colt also agreed to pay for merchandise, inventory and prepaid items.

5. Prudential Insurance Company (Prudential) held first mortgages on those properties.

6. Bowl America evidently relied on Banks' connections with prominent Baltimore figures such as Carroll Rosenbloom and John Unitas, Banks' substantial holdings in Brunswick Corporation stock, Brunswick's recommendation of Banks, and his apparent success in developing three modern bowling establishments.

chain contain no entries after January 1964.

At about the same time, Fair Lanes and Banks reopened their discussions. Banks agreed to allow an accounting firm to audit the Colt chain's books and records for Fair Lanes. That audit showed that the five former Bowl America houses and the three original Colt houses were heavily in debt.

In the spring of 1964, the Colt chain was being pressed by its numerous creditors, including Brunswick, Bowl America, and Prudential. Banks negotiated separately but concurrently with Brunswick, with Bowl America, and with Fair Lanes for a take-over of some or all of the bowling establishments then in the Colt chain.

Brunswick, the supplier of the equipment in three of the five former Bowl America establishments as well as in the three original Colt establishments, was perfecting its plans, which were put into effect later in 1964, to take over the operation of some financially embarrassed bowling establishments in various sections of the country. In the spring of 1964, Brunswick proposed to Banks that if, by September 1964, Banks had disposed of all his bowling houses except the three original Colt houses in Metropolitan Baltimore and the Colt house in Delaware, Brunswick would be prepared to negotiate refinancing arrangements and would be in a position to assume the operation of the three original Colt houses in Metropolitan Baltimore in November or December 1964. Brunswick further proposed that Banks, or Brunswick for him, might find operators to take over the operation of the five Bowl America establishments on an interim basis. On May 12, 1964, Brunswick believed that Banks had agreed to Brunswick's proposal. Brunswick was not prepared to purchase, operate or refinance for Banks the Colt chain or any part of the Colt chain in May or June 1964.

Meanwhile, Bowl America was discussing with Banks the possibility of taking back the five Bowl America establishments and working out a means for payment of the indebtedness due it. On May 19, Banks suggested to Bowl America that he might sell the five Bowl America establishments to Fair Lanes along with the three Colt establishments. In late May, Prudential informed Colt Realty that it would commence foreclosure proceedings against the three original Colt establishments if the mortgage delinquencies were not cured by June 26. On May 25 Banks proposed to Bowl America that he return the five Bowl America houses to it along with $100,000 worth of Northeast Thruway bonds as collateral for payment of his debts to Bowl America. That proposal was acceptable to Bowl America, although it is doubtful whether Banks was capable of performing it.

In fact, on May 25 Banks had already agreed to sell all eight establishments to Fair Lanes. On May 28, Banks and Fair Lanes signed a series of agreements under which Fair Lanes' acquired the stock of the companies which operated the five former Bowl America establishments, and the stock of Colt Lanes, Inc., which owned the stock of the companies which operated the three original Colt establishments. Fair Lanes did not assume the liabilities of the companies which operated the former Bowl America establishments.

In consideration for the transfer to Fair Lanes of the leaseholds of the three Colt houses (which were subject to ground rents of $28,500 per year), Fair Lanes assumed obligations under the three Prudential mortgages totalling $886,605, paid accrued obligations of $36,000, and gave Banks $80,000 in cash and promissory notes. The obligations due Colt Realty from Banks and the other Colt corporations were forgiven, and Banks was effectively barred from giving Bowl America the mortgages on the Colt properties promised in the summer of 1963. Banks agreed with Fair Lanes that he would not engage in the bowling business for five years within a 50-mile radius of Baltimore.

The agreements further provided that Banks was to receive Fair Lanes' stock for the five Bowl America establishments. However, the stock allocated to each of the establishments was to be delivered only if the particular establishment was (1) closed and dismantled by Fair Lanes, or (2) operated by Fair Lanes, or (3) sold by Fair Lanes, or (4) remained closed for three years. In anticipation of possible bankruptcy proceedings, it was agreed that Fair Lanes would not be obligated to deliver any stock to Banks if the operating corporations were adjudged bankrupt or their assets were placed in the hands of a receiver.

Fair Lanes did not assume any obligation to pay the rent at any of the five former Bowl America establishments; indeed, it was agreed that other obligations would be paid before any such rent was paid.

As a result of these agreements, Bowl America faced contingent leasehold obligations on its five former houses of over $200,000 a year, amounting to more than $3,000,000 in all, without the right to operate any of those establishments. Fair Lanes had the power to close the five establishments with impunity.

By means of the agreements with Banks, Fair Lanes had not only prevented Bowl America from regaining its five establishments and thereby reentering the Baltimore market, but it had also left Bowl America with crippling financial obligations likely to affect its vigor as Fair Lanes' principal competitor in Metropolitan Washington. Moreover, by acquiring the most valuable assets of Colt Realty and none of its liabilities, Fair Lanes had minimized the value of the guarantees given by Colt Realty and Banks to Bowl America.

Before the June 3 settlement Fair Lanes knew that Colt was in arrears to the Baltimore Gas & Electric Company and that service was about to be denied, but Fair Lanes made no effort to pay the accumulated gas and electric bills when it took over possession of the eight establishments. Service was therefore cut off (except, inadvertently, at Bowl America Odenton) and the establishments were closed. On June 5 Fair Lanes offered to pay a share of the arrearages at the three original Colt establishments and service was restored to them. Fair Lanes made no such offer with respect to the five former Bowl America establishments. Service was restored to them only after Bowl America regained possession.

Defendants also stripped the files from the main office of the Colt chain and removed the records from the five former Bowl America houses. Among those records was vital information regarding the names and addresses of leagues and league bowlers who had indicated their intention to bowl at those establishments that summer or next season. Fair Lanes posted signs on the closed establishments directing bowlers to the nearest Fair Lanes house. It issued orders to its managers to place Bowl America bowlers and leagues in Fair Lanes establishments. A few leagues were thus transferred.

Although not required to do so by the May 28 agreements, Fair Lanes made certain payments in order to obtain good will. Those payments included bowling prize funds owed by Colt with respect to the five former Bowl America houses, and back salaries to employees of those houses for work performed before Fair Lanes took over.

Fair Lanes coveted the chance to operate the former Bowl America establishment at Glen Burnie, and contemplated operating some of the others if it could obtain a rent reduction. On June 2, Fair Lanes proposed to Bowl America that they jointly request the landlords of the five former Bowl America establishments to reduce the rents. Bowl America refused, and each then made separate proposals to the landlords. The landlords considered Fair Lanes' proposals unattractive. Instead they chose to make agreements with Bowl America, under which Bowl America agreed to make up the Colt rent arrearages with respect to the five former Bowl America

houses, and pay all future rents. In return, each landlord agreed to distrain and put Bowl America back in possession. At Bowl America's expense, distraints were levied; but when Bowl America, under the landlords' authority, attempted to reopen its five former houses, Fair Lanes caused Bowl America's agents to be arrested for trespassing.[7] By June 23, however, Bowl America was back in possession. The next day, Fair Lanes put the corporations which operated the five former Bowl America establishments into voluntary bankruptcy. Bowl America obtained authorization from the Referee in Bankruptcy to operate the five former Bowl America establishments and later paid $16,250 to the Receiver for the assets of the operating corporations of those five establishments. At Fair Lanes' instigation, counsel for the bankrupts, who had been chosen by Fair Lanes, obstructed Bowl America's recovery of the records of the five establishments, and attempted to hinder the operation of those centers. The three original Colt establishments eventually became part of Fair Lanes' Metropolitan Baltimore chain.

During the next season (fall of 1964 through spring of 1965), a few leagues moved from Bowl America to Fair Lanes and vice versa. The turnover of league business from Bowl America to Fair Lanes that season amounted to less than 1.5% of Bowl America's annual volume, well within the 10% normal turnover range.

While Bowl America lost considerable money operating its Baltimore houses before the sale to Banks in 1963, Bowl America's operation of those houses resulted in slight profits and slight losses during the years after June 1964. Bowl America subleased Cedonia to Brunswick on March 1, 1965, but continues to be primarily liable on the lease.

Additional facts with respect to damages will be included under that heading, below.

### Ultimate Findings, Conclusions of Law, and Discussion

The Court has jurisdiction over the subject matter of this action and the parties thereto. Venue is proper.

### Lines of Commerce and Markets

■ The product markets in which the competitive effects of defendants' acts should be measured are (1) the operation of bowling establishments, (2) the operation of duckpin bowling establishments, (3) the operation of tenpin bowling establishments and (4) the operation of modern bowling establishments. The latter three are submarkets of the first in Metropolitan Baltimore.

■ Defendants deny that the operation of modern bowling establishments constitutes a submarket.[8] However, modern bowling establishments offer a unique cluster of services and facilities not available in older, non-modern bowling houses. See United States v. Philadelphia National Bank, 374 U.S. 321, 326, 356, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Company v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Publications of the bowling business and its suppliers, including defendants' prospectus and annual reports, recognize modern bowling establishments as a class apart, the cream of the bowling business. See Brown Shoe Co. v. United States, supra; United States v. Paramount Pictures, 334 U.S. 131, 172–173, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); International Boxing Club v. United States, 358 U.S. 242, 252, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). Modern bowling establishments are located to attract a white, suburban clientele. See Brown Shoe Co. v. United States, supra; United States v. Ford Motor Company, 286 F.Supp. 407, 414 (E.D. Mich.1968). Business reality compels

---

7. They were acquitted in Dundalk Magistrate's Court.

8. Modern bowling establishments were defined and described at the beginning of this opinion.

**1090**

recognition of the operation of modern bowling establishments in Metropolitan Baltimore as a separate submarket.

■■■ The geographic market in which the anticompetitive effects of defendants' acts are to be measured must be charted by careful selection of the market area in which the seller operates, and to which the purchaser (here the bowler) can practicably turn. United States v. Philadelphia National Bank, supra, 374 U.S. at p. 359, 83 S.Ct. 1715, 10 L.Ed.2d 915. Modern bowling establishments draw a substantial percentage of their total league and tournament custom from outside the immediate vicinity of the centers themselves. High speed roads—the Beltway, the Jones Falls Expressway, and the Harbor Tunnel—enable many customers to use conveniently the facilities of modern bowling establishments in all parts of the Metropolitan area. Thus the factor of inconvenience is not as significant in reducing customer alternatives as defendants contend.[9] See United States v. Philadelphia National Bank, supra, at p. 358, 83 S.Ct. 1715, 10 L.Ed.2d 915; United States v. First National Bank & Trust Co. of Lexington, 376 U.S. 665, 668, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y.1965). Moreover, Fair Lanes and Bowl America are chains, controlled and managed on a metropolitan and regional basis. They plan individual houses as parts of a metropolitan system. Pricing decisions are made for the chain as a whole, and advertising is for the chain. Representatives of the principal suppliers deal with the chief officers of the chain. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The geographic market, or "area of effective competition" between the chains, is Metropolitan Baltimore.

*Interstate Commerce*

Both Fair Lanes and Bowl America rent and purchase substantial amounts of bowling equipment and purchase substantial amounts of bowling supplies from manufacturers and suppliers outside Maryland. They have financed the purchase of such equipment and the operation and expansion of their chains in substantial part by loans and capital obtained in interstate transactions with persons and corporations located in other states. They advertise tournaments and to a minor extent other operations on television and radio and in newspapers, all in interstate commerce. On the other hand, only a few bowlers and spectators come to the establishments in Metropolitan Baltimore from outside Maryland.

Defendants concede that the operation of bowling establishments directly and substantially affects interstate commerce.

■■■ The Court finds and holds that the operations of the Fair Lanes, Bowl America and Colt establishments were also in interstate commerce.[10] Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc., 356 F.2d 371 (9 Cir. 1966), cert. den., 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966); Breier v. Northern Calif. Bowling Proprietors' Ass'n, 316 F.2d 787 (9 Cir. 1963), reversing Monument Bowl. Inc. v. Northern California Bowling Proprietors' Ass'n, 197 F.Supp. 208 (N.D.Cal.1961). The amount of interstate activity shown is greater than that alleged in Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2 Cir. 1964).

■■■ The Court further finds and holds that the acts complained of substantially affected the interstate aspects of the bowling business in Metropolitan Baltimore. The acquisition of the Colt chain by Fair Lanes wiped out Colt's dealings with its out-of-state creditors

---

9. Bowlers are not restricted to a "three mile limit", as defendants suggest.

10. It was stipulated that if the Court should hold that the operation of the

Fair Lanes and Bowl America establishments in Metropolitan Baltimore were *in* interstate commerce, the same ruling should apply to the Colt establishments.

and suppliers, and temporarily prevented Bowl America from establishing such interstate dealings with respect to the Baltimore bowling market. If Fair Lanes had been successful in preventing Bowl America from recovering the five establishments, the effect on interstate commerce would have been prolonged. This holding will be elaborated in the discussion of the several sections of the antitrust laws, below.

### Sherman Act § 1

■ The acquisition of the Colt chain by Fair Lanes in May-June 1964 and the agreements by which the acquisition was accomplished constituted both a contract and combination in restraint of trade in violation of § 1 of the Sherman Act.

Before the acquisition Fair Lanes was the largest chain of bowling establishments in Metropolitan Baltimore. It controlled 36.3% of the total lanes, 46.1% of the duckpin lanes, 15.5% of the tenpin lanes and about 33% of all lanes in modern establishments.[11] The Colt chain, which then included the five former Bowl America establishments as well as the three original Colt establishments, was the second largest chain, and was the principal competitor of Fair Lanes in Metropolitan Baltimore.

Fair Lanes' acquisition of the Colt chain gave Fair Lanes 57.7% of the total lanes in Metropolitan Baltimore, 68.6% of the tenpin lanes, 52.6% of the duckpin lanes, and about 67% of all lanes in modern establishments.

■ The acquisition eliminated the significant competition between the two chains. United States v. First National Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y. 1965). See also United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Third National Bank, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968).

■ In the agreements by which the acquisition was made, Banks, who owned the controlling interest in the Colt chain, agreed not to compete with Fair Lanes within 50 miles of Baltimore for a period of five years. The terms of the agreements, considered along with the conduct of defendants after the acquisition, and the general policy and practices of Fair Lanes, as shown in the statement of historical facts, above, and more elaborately in the detailed findings of fact filed with the clerk, show that Fair Lanes acquired the eight Colt establishments with the intention of closing down one or more of the former Bowl America establishments. These facts show that the object and the effect of the agreements were to eliminate competition, thereby unreasonably restraining trade. Citizen Publishing Company v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); United States v. Grinnell Corp., 236 F. Supp. 244, 255 (D.R.I.1964), affirmed 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

■ Fair Lanes and its subsidiary corporations and their respective officers joined together in planning the acquisitions which were calculated to reduce competition, to restrain trade and to damage Bowl America, a potential competitor in Metropolitan Baltimore.[12] Thus, defendant corporations and the individual officers of the several corporations, who conspired with the officers and employees of other defendant corporations, engaged in a combination and

---

11. In May 1964 Fair Lanes operated a total of 588 lanes in 16 establishments in Metropolitan Baltimore.

12. Bowl America was also an actual competitor of Fair Lanes in Metropolitan Washington.

conspiracy in violation of § 1.[13] Perma-Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

It is a close question, depending upon principles which have not been authoritatively stated by the Supreme Court or the Fourth Circuit, whether Banks was a co-conspirator with defendants during the negotiations between Banks and Fair Lanes in May 1964 which resulted in the agreements of May 28, 1964. The Court finds that there was no conspiracy between Banks and defendants before May 1964. Since Banks is not a party to the case and since it is clear that there was a contract, a combination and a "bathtub" conspiracy in violation of § 1, with the object and effect of damaging Bowl America, a ruling on the question whether Banks was a co-conspirator during May and June 1964 is unnecessary. The Court finds as a fact that any damages which could be recovered by plaintiffs against defendants by reason of such a limited conspiracy with Banks can be recovered against defendants as a result of the violations which have been proved.[14]

*Failing Company*

Defendants contend that Fair Lanes acquired a failing company and thus the acquisition did not violate § 1 of the Sherman Act. It appears, however, the failing company doctrine is inapplicable in this case for several reasons.

Fair Lanes acquired the Colt chain in order to restrain competition, as found in the discussion of Sherman Act, § 1, above. An important element of the failing company defense—lack of anti-competitive purpose—is absent from this case. International Shoe Co. v. F. T. C., 280 U.S. 291, 302, 50 S.Ct. 89, 74 L.Ed. 431 (1930); see Brown Shoe Co. v. United States, supra, 370 U.S. at 331, 82 S.Ct. 1502, 8 L.Ed.2d 510. Moreover, the Brunswick and Bowl America proposals offered means by which the eight houses of the Colt chain could be maintained as vital competitive factors in the Metropolitan Baltimore bowling market. Fair Lanes therefore fails to meet another element of the failing company defense—that there be no other prospective purchaser. *International Shoe,* supra; *Brown Shoe,* supra, at 319, 82 S.Ct. 1502, 8 L.Ed.2d 510; Citizen Publishing Company v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969); see Merger Guidelines, No. 9, United States Department of Justice, 1 C.C.H. Trade Reg.Rep. p. 4430 (1968). No public interest in mitigating injury to innocent individuals or communities was proved by Fair Lanes. Cf. *International Shoe,* supra; and see In the Matter of United States Steel Corp., Federal Trade Commission, docket no. 8655, December 2, 1968. Finally, the failing company defense has never been applied in a case under § 1 of the Sherman Act, where as here, competition has been actually as well as potentially restrained. In the *Citizen Publishing Company* case, the Supreme Court indicated an unwillingness to extend or expand the failing company defense, saying: "We confine the failing company doctrine to its present narrow scope". 394 U.S. at 139, 89 S.Ct. at 931. The applicability of the failing

---

13. The Court intimates no opinion as to whether it is a violation of § 1 for a single corporation to conspire only with its own officers.

14. The Court further finds that any claimed damages which could be recovered only if Banks were a party to the conspiracy have not been proved. Such claimed damages, e. g., the inability of Bowl America to collect from the Colt organization or Banks the various arrearages accumulated between June 1963 and May 1964, was not the result of any of the violations of the antitrust laws alleged by plaintiffs in this action. See discussion under damages, below.

company defense to a § 1 claim would therefore be doubtful, even if Fair Lanes had satisfied the burden of proving the defense which has been imposed on the party relying on it in cases arising under § 7 of the Clayton Act.

### Sherman Act § 2

Plaintiffs claim that defendants attempted, combined and conspired to monopolize the bowling business in Metropolitan Baltimore and of each sub-market therein. They do not claim that defendant actually monopolized such market or submarket.

 Again, the controlling principles are well settled. There may be an attempt to monopolize, or a combination or conspiracy to monopolize, without the offender or offenders actually having monopoly power.[15] But an essential element of an attempt to monopolize, or of a combination or conspiracy to monopolize, is a specific intent to destroy competition or build monopoly. Neither rough competition nor unethical business conduct is sufficient. The requisite intent must be present and predominant. American Football League v. National Football League, 205 F.Supp. 60 (D.Md. 1962), aff'd 323 F.2d 124 (4 Cir. 1963). The intent must be to gain control over some relevant market sufficient to set prices in that market or to exclude competitors therefrom. United States v. Aluminum Co. of America, 148 F.2d 416, 432 (2 Cir. 1945); United States v. Grinnell Corp., 236 F.Supp. 244, 248, 257 (D. R.I.1964) (Wyzanski, J.), aff'd 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); Lessig v. Tidewater Oil Co., 327 F.2d 459 (9 Cir.), cert. den. 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). For reasons discussed below, such an intent has been shown in this case.

 Proof of ability of defendants to achieve monopoly is not a necessary element of an attempt to monopolize. American Tobacco Co. v. United States, 328 U.S. 781, 789, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); United States v. Consolidated Laundries, 291 F.2d 563, 573 (2 Cir. 1961). See also Lessig v. Tidewater Oil Co., 327 F.2d at 474. And it has been held that it is not necessary for a plaintiff to prove a "dangerous probability" that monopolization will result from a conspiracy or attempt. United States v. Consolidated Laundries, supra, 291 F.2d at 573. In Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Court quoted from Swift & Co. v. United States, 196 U.S. 375, 376, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, as follows: "[W]hen that intent [to monopolize] and the consequent dangerous probability exist, this statute [the Sherman Act], like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." See also Lessig v. Tidewater Oil Co., 327 F.2d at 474; United States v. Aluminum Co. of America, supra, 148 F.2d at 431–432.

 The provisions of § 2 "have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce". Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356 (1934); Standard Oil Co. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619 (1911). " 'Any part' is construed to mean an appreciable part of interstate or foreign trade or commerce." United States v. Paramount Pictures, 334 U.S. at 173, 68 S.Ct. at 936, 92 L.Ed. 1260. "[M]onopolization of the sale of any one product in any one city may be unlawful, even though sales throughout the nation are not controlled, * * *." United States v. National City Lines, 186 F.2d 562, 567 (7 Cir.), cert. den. 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351 (1951).

---

15. "Monopoly power is the power to control prices or exclude competition." United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Fair Lanes argues that its purchases of supplies for resale to bowlers were *de minimis,* and that, therefore, no appreciable part of interstate commerce is involved in this case. This Court finds, however, that the purchase of supplies for resale to bowlers and the purchase of supplies to outfit the establishments, as well as the purchases of equipment and the financing of the construction and equipment of the establishments, constituted a substantial amount of interstate commerce. If the dollar amount of interstate commerce involved is substantial, the fact that "this substantial amount of interstate commerce amounted to only 1% of the total industry's volume is without significance". United States v. Consolidated Laundries, supra, 291 F.2d at 572.

Several elements present in this case are indicative of a purpose to acquire a monopoly. They include:

(1) The large percentage of total lanes in each category in Metropolitan Baltimore acquired by Fair Lanes as a result of the contracts with the Colt organization. American Tobacco Co. v. United States, supra; United States v. Paramount Pictures, supra; United States v. Aluminum Company of America, 148 F.2d 416 (2 Cir. 1945); see United States v. Aluminum Company of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed. 2d 314 (1964); United States v. Continental Can Co., supra.

(2) The intention of Fair Lanes to close one or more of the establishments acquired from Colt. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. Eastman Kodak Co., 226 F. 62, 76 (W.D.N.Y.1915).

(3) The agreement of Banks not to compete. Citizen Publishing Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d (1969); Schine Chain Theatres v. United States, supra.

(4) The previous attempts by Fair Lanes to use its preeminent position in a market to prevent others from entering that market. American Tobacco Co. v.

United States, supra, 328 U.S. at 796, 66 S.Ct. 1125, 90 L.Ed. 1575; United States v. Paramount Pictures, supra, 334 U.S. at 174, 68 S.Ct. 915, 92 L.Ed. 1260. In the instant case the evidence shows that Fair Lanes went even further and attempted to use its position as a large customer to persuade Brunswick not to lease equipment or sell equipment on credit to potential competitors of Fair Lanes in a chosen area.

Fair Lanes claims it never attempted either to exclude competitors or to set prices. What Judge Learned Hand said in response to a similar contention in United States v. Aluminum Company of America, 148 F.2d 416, 431 (2 Cir. 1945) is applicable to Fair Lanes, though on a smaller scale.

"* * * It [Alcoa] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary'. So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent." 148 F. 2d at 431.

This passage was quoted with approval by the Supreme Court in American Tobacco Co. v. United States, 328 U.S. 781, 813, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

The Court concludes that defendants did attempt, combine with the Colt organization, and conspire among themselves (see note 13), to monopolize a part of interstate commerce—namely, the operation of tenpin establishments and modern establishments in Metropolitan Baltimore—in violation of § 2 of the Sherman Act. It is not necessary to decide whether defendants attempted, com-

bined and conspired to monopolize the operation of duckpin establishments or bowling establishments generally in Metropolitan Baltimore.

### Standing

■ Defendants challenge plaintiffs' standing to maintain this action. The claim based upon § 7 of the Clayton Act raises particular points which will be discussed separately below. The principles which control the question of standing with respect to the claims based upon §§ 1 and 2 of the Sherman Act have been clearly stated by the Supreme Court and by the Fourth Circuit. "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948). "The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury. If the damage was merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured 'by reason of anything forbidden in the antitrust laws' as contemplated by the Clayton Act". South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414, 419 (4 Cir. 1966). See also Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961).

In South Carolina Council of Milk Producers, Inc. v. Newton, supra, the Court noted that § 4 of the Clayton Act, 15 U.S.C.A. § 15, "does not in its terms limit relief to persons in a direct contractual or competitive status with the persons whose conduct allegedly violates the proscriptions of the Sherman Act", 360 F.2d at 417, and said, "If a plaintiff can show himself within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby, then he has standing to sue under section 4." 360 F.2d at 418. The treble-damage remedy has repeatedly been held available to potential competitors who were excluded from a market by antitrust violations. American Federation of Tobacco Growers, Inc. v. Neal, 183 F.2d 869 (4 Cir. 1950); North Texas Producers Ass'n v. Young, 308 F.2d 235, 242–243 (5 Cir. 1962), and cases cited therein.

■ The evidence in the present case establishes that in May 1964 Bowl America was about to reenter the Metropolitan Baltimore market. It had retired from the operation of bowling establishments in Baltimore in June 1963, but, because it remained liable for rent to the landlords of the five Bowl America establishments, was negotiating with Banks in the spring of 1964 to reacquire those five establishments.[16] Defendants' agreements with the Colt organization were designed to prevent Bowl America from doing so, and to leave Bowl America liable on the leases of the five former Bowl America establishments whether those establishments or any of them were operated or abandoned by Fair Lanes. Bowl America was clearly within the " 'target area' of the defendants' illegal * * * [acquisitions]". South Carolina Council of Milk Producers, Inc. v. Newton, supra, 360 F.2d at 418, quoting Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 362, 365 (9 Cir. 1955). The damages allowed below were proximately caused by the acts of Fair Lanes in violation of §§ 1 and 2 of the Sherman Act.

### Clayton Act § 7

Plaintiffs argue that the acquisition of the Colt chain by Fair Lanes also violated § 7 of the Clayton Act, 15 U.S.C.A. § 18, and that plaintiffs are entitled to recover treble damages for such violation. Defendants argue that no private suit for treble damages can be based upon a violation of § 7.

16. Plaintiffs have shown more than a "speculative assertion of a mere wish, desire or intention to engage in business". See *North Texas Producers Ass'n*, supra.)

Defendants do not deny that private plaintiffs as well as the United States can sue to enjoin mergers which violate § 7.[17] See, e. g., American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2 Cir. 1958). Defendants argue, however, (1) that § 7 proscribes mergers which *may* have certain anti-competitive impact, citing Brown Shoe Co. v. United States, 370 U.S. 294, 317, 332, 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. E. I. duPont de Nemours & Co., 353 U.S. 586, 597, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057; (2) that the mere probability of some future effect on competition does not justify the award of treble damages now, citing Gottesman v. General Motors Corp., 221 F.Supp. 488, 493 (S.D.N.Y.1963), cert. den. 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964); Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 728, n. 3 (8 Cir. 1964); Bailey's Bakery, Ltd. v. Continental Baking Company, 235 F.Supp. 705, 716–717 (D. Hawaii 1964); and therefore (3) that a private party should not be entitled to maintain an action for treble damages under § 7. Defendants note that if a private party can show that a merger has already caused an unreasonable restraint of trade and that he has actually suffered damages as a direct result thereof, he can sue and recover in a treble damage action under § 1 of the Sherman Act.

■ In this case Bowl America has shown that the acquisition of the Colt chain by Fair Lanes unreasonably restrained trade—at least for a short period—and that Bowl America actually suffered damages as a result thereof, including the fees and expenses necessary for it to regain possession of the five Bowl America establishments.[18] Bowl America, therefore, has a right of action based on § 1 of the Sherman Act, under which it can recover whatever damages it could recover for a violation of § 7 of the Clayton Act. It is not necessary to decide in this case whether and under what circumstances a private right of action for treble damages under § 7 can ever be maintained. Cf. Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521 (S.D.N.Y.1956).

### The Common Law Claim

■ Little or no attention was given in the briefs and oral arguments to plaintiffs' claim based upon the common law of Maryland. No discussion of that claim is necessary, since even if plaintiffs have proved such a claim, their damages would not be greater than those recoverable under §§ 1 and 2 of the Sherman Act.

### Damages

The applicable rule for determining damages is not disputed:

" * * * When the fact is certain that anti-trust injury has been inflicted on a party, it is sufficient as a basis for arriving at the damages that the evidence contains probative elements from which on reasonable inference their extent can with judgment be estimated." Arthur Murray, Inc. v. Oliver, 364 F.2d 28, 35 (8 Cir. 1966).

See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); South Carolina Council of Milk Producers, Inc. v. Newton, supra, 360 F.2d at 419–420; Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143, 158–159 (D. Md.1968), and cases cited therein.

Bowl America claims as damages:

■ (a) *Legal and accounting fees* —Plaintiffs paid $19,236.27 in legal and accounting fees for professional services rendered in connection with the reacquisition of the five Baltimore houses. They were required to pay those fees as a direct and proximate result of defendants' acts in acquiring the Colt chain, in attempting to prevent plaintiffs from reacquiring physical possession of their Baltimore establishments, and in

---

17. Plaintiffs are not pressing any claim for an injunction in this case.

18. The prompt action by Bowl America prevented the unreasonable restraint of trade from continuing at the planned level.

other acts, all of which have been found to violate §§ 1 and 2 of the Sherman Act. They are a proper item of damages recoverable herein.

■ (b) *Other payments*—Bowl America paid $16,250.00 to the receiver in bankruptcy to obtain the right to operate the five Baltimore houses. These payments were directly and proximately caused by defendants' acts in violation of §§ 1 and 2 of the Sherman Act, and are a proper item of damages recoverable herein.

■ Plaintiffs also claim $2,575.00 spent to recover the liquor licenses at two of the establishments, which had been issued to two individuals who refused to transfer the licenses to nominees of Bowl America without some payment. The proof is not sufficient to show that those licensees would have turned the licenses over to Bowl America without payment under any circumstances. This claim for $2,575.00 is disallowed.

■ (c) *Salaries*—As a direct result of the acts of defendants which have been found to violate §§ 1 and 2 of the Sherman Act, officers and employees of Bowl America were required to devote a considerable amount of time to the recovery and reopening of the five Bowl America establishments. The reasonable value of those services—measured by the salaries of the officers and employees and the time which they would otherwise have spent on other work for Bowl America—was $5,661.67, which is a proper item of damages recoverable in this case.

(d) *Lost profits*—Bowl America's total lineage per lane was 73.33% of Fair Lanes' lineage per lane in fiscal 1963, and 73.70% in fiscal 1966. In fiscal 1965, however, Bowl America's total lineage per lane in Metropolitan Baltimore was only 70.62% of Fair Lanes' total lineage per lane, 3% less than in the two most comparable years.

The relative decline in Bowl America's business in fiscal 1965 was due in part to its curtailment of expenditures for promotions, personnel and advertising for its Baltimore houses, in order to conserve Bowl America's cash position. The poor cash position of Bowl America during fiscal 1965 was due primarily (1) to the losses which Bowl America had sustained before May 1963, and (2) to the continuing rental obligations which it had assumed in connection with the five establishments which were transferred by Bowl America to Colt in May 1963.[19] Nevertheless, the predatory acts of Fair Lanes in May and June 1964 required Bowl America to tap its relatively meager cash resources to make the payments listed as recoverable damages in paragraphs (a) and (b), above, instead of using those resources to promote its business. The relative decline in Bowl America's business in fiscal 1965 was also caused in part by actions of Fair Lanes which have been held to violate the antitrust laws, including the abrupt closing by Fair Lanes of the five former Bowl America houses as soon as they were acquired by Fair Lanes early in June 1964, the attempts by Fair Lanes to persuade the customers of those houses to switch to a Fair Lanes' house, and the delay in the reopening of the houses caused by the acts of Fair Lanes set out as historical facts, above.[20]

■ The extent to which those acts of Fair Lanes caused Bowl America to lose business in 1965 cannot be established with certainty, because Bowl America cannot show exactly how many bowlers would otherwise have bowled at a Bowl America establishment in 1964–1965. This difficulty does not prevent the lost business profits from being recovered as damages, since Fair Lanes' antitrust violations undoubtedly made a material contribution to the loss. Story Parchment Co. v. Paterson Parchment

19. Bowl America had not been relieved of those obligations by Colt as required by the 1963 agreements.

20. The anticompetitive acts of Fair Lanes deprived Bowl America of the benefit it would otherwise have received from the active promotion by Colt of the five Bowl America houses during the year they were operated by Colt.

Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Materials Co., supra, 273 U.S. at 379, 47 S.Ct. 400, 71 L.Ed. 684; Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 713 et seq. (9 Cir. 1959); Advance Business Systems & Supply Co. v. SCM Corp., supra, 287 F.Supp. at 158. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700–702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Taking all factors into account, the Court finds that Bowl America is entitled to recover $20,000.00 for profits lost during the year 1964–65.[21]

Bowl America failed to prove that the anticompetitive activities of Fair Lanes caused Bowl America any loss of profits during the years after 1964–65. Since that year the results of Bowl America's operations in Metropolitan Baltimore have been superior to the results of its operations in fiscal 1963 (the year of the sale by Bowl America to Banks) and in previous years. Indeed, since 1966, Bowl America's results have compared favorably with those of Fair Lanes in Metropolitan Baltimore.

■ (e) *Colt Arrearages and Related Legal Fees*—After reacquisition of the five Baltimore establishments, Bowl America assumed and paid or will pay arrearages with respect to those establishments. Those arrearages have a present value of $103,374.67. Bowl America has also paid $15,629.67 in legal and accounting fees for professional services in an effort to collect those arrearages from Banks.

Bowl America contends that, by acquiring the main assets of Colt Realty, i. e., the three original Colt leaseholds, Fair Lanes destroyed the value of the

agreement to indemnify given to Bowl America by Colt Realty and Banks in the summer of 1963, and that Fair Lanes thus prevented Bowl America from recovering the Colt arrearages with respect to the five Bowl America houses from Banks. The Court finds, however, that when Fair Lanes acquired those leaseholds, Colt Realty and Banks were so heavily in debt, secured and unsecured, that their unsecured indemnification promise was practically worthless to Bowl America. Bowl America has failed to prove that this feature of the agreements between Fair Lanes and the Colt organization caused more than nominal damage to Bowl America.[22]

■ (f) *Future Rent at Cedonia and Additional Interest and Finance Charges* —Bowl America paid or will be required to pay $19,000.00 in rentals to the landlords of the Cedonia bowling establishment following its sublease to Brunswick. The Court finds that Cedonia was not a profitable establishment, and that its sublease was not proximately caused by any acts of Fair Lanes.

■ Bowl America has paid $18,-485.66 in additional interest and finance charges in connection with refinancing obligations of the five Baltimore houses, including in one instance refinancing a note which also covered obligations unrelated to those houses. These additional charges arose from Bowl America's assumption of an obligation to pay the Colt arrearages and the future rental payments with respect to its reacquired houses. The assumption of these new obligations would have been necessary even if Bowl America had reacquired the five establishments directly from Colt and Banks, and is not an item of damage

---

21. Bowl America showed that in fiscal 1965 its profits included $.325 per game from bowling, $.079 per bowling game from ancillary sales and rentals, and $.06 per bowling game from fountain sales, a total of $.464 per bowling game. The 3% relative reduction in its lineage per lane amounted to a total of 43,224.72 lost games. Multiplying the number of lost games by the total profit per game gives a figure of $20,056.27.

22. The Court has already found that the Colt arrearages incurred from early 1964 until the acquisition of the Colt chain by Fair Lanes in May-June 1964 were not proved to have been accumulated as part of the conspiracy among the defendants or as a result of any other antitrust violation complained of by plaintiffs.

proximately caused by Fair Lanes' anti-competitive activity.

■ (g) *Loss of Investment in Going Concern Value*—The Court finds that Bowl America did not prove a reduction in the going concern value of its business compensable under the cases it cites. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Atlas Bldg. Products Co. v. Diamond Block and Gravel Co., 269 F.2d 950, 958–959 (10 Cir. 1959), cert. den. 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960).

The allowable items, therefore, are: (a) $19,236.27, (b) $16,250.00, (c) $5,661.67 and (d) $20,000.00, a total of $61,147.94, which should be trebled, making the amount of the damages awarded $183,443.82.

Although the complaint contained a prayer for an injunction, it was not pressed, and no need for an injunction at this time has been shown.

Plaintiffs are also entitled to their reasonable attorneys' fees, to be fixed by the Court after a further hearing.

### SUPPLEMENTARY OPINION

The parties have agreed upon the amount of allowable costs—$4,207.79—but are far apart on the amount of attorneys' fees, for which plaintiffs seek a total of $162,433.75, made up as follows:

"Wald, Harkrader & Rockefeller

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| W. W. Ross | 881.50 | $50/hr. | $ 44,075.00 |
| D. H. Green | 1,605.50 | 45/hr. | 72,247.50 |
| J. E. Hoffman | 475.50 | 35/hr. | 16,642.50 |
| A. W. Sierck | 691.25 | 25/hr. | 17,281.25 |
| Other Attorneys | 59.00 | 25/hr.* | 1,475.00 |
| Total | 3,712.75 | | $151,721.25 |

Burke, Gerber & Wilen

| Attorney | Hours | Rate | Total |
|---|---|---|---|
| Stanley Wilen | 100.50 | $50/hr. | $ 5,025.00 |
| Bernard Denick | 227.50 | 25/hr. | 5,687.50 |
| Total | 328.00 | | $ 10,712.50 |
| Total Attorneys' Fees | | | $162,433.75 |

Defendants do not dispute the number of hours spent, but argue that the number of hours spent was unnecessarily large, and that the fee is much too high under all the circumstances.

The factors which should be considered were discussed at length in the recent opinion of this Court in Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143 (D.Md.1968), and in a recent opinion by Judge Gignoux in Farmington Dowel Products Co. v. Forster Mfg. Co., Inc., et al., 297 F. Supp. 924 (D.Me.1969)**.

Plaintiffs' attorneys did not have the benefit of a prior judgment or decree,

---

* Includes time of senior partners as well as associates; carried here at lowest rate since they did not bear the principal responsibility for prosecution of the litigation."

** In the instant case both parties agree that the fee arrangement between plaintiffs and their counsel should not be disclosed, thus making irrelevant one of the points decided by Judge Gignoux, and that it is immaterial how the total fee which may be allowed plaintiffs is apportioned between the two firms.

and were opposed by able and resource-full attorneys. The case was neither very large nor very small, neither very complex nor very simple, as antitrust cases go. No doubt some of the points which now seem relatively simple required a considerable amount of time to develop, but the Court is satisfied that the case was overprepared and that there was duplication of effort. More importantly, plaintiffs' counsel spent much time attempting to prove large items of damages which they failed to prove; the amount of damages awarded was about 10% of the amount plaintiffs claimed in their final argument.

On the other hand, plaintiff thwarted an attempt to monopolize an important part of the bowling business in Baltimore, and established (subject to possible review) a number of points which may aid persons in other areas who are faced with similar problems.

All factors considered, the Court finds that the plaintiffs are entitled to recover attorneys' fees in the amount of $70,000.